IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

KEVIN A. WATSON,              )
                             )
            Plaintiff,       )        Case No. 7:21-cv-00119
                             )
v.                           )        **MEMORANDUM OPINION**
                             )
B.L. KANODE, *et al.*,        )        By:   Hon. Thomas T. Cullen
                             )              United States District Judge
            Defendants.      )

Plaintiff Kevin A. Watson ("Watson"), a Virginia inmate proceeding *pro se*, brought this action under 42 U.S.C. § 1983 against various officials at River North Correctional Center ("River North"). This matter is before the court on a motion to dismiss Watson's second amended complaint filed by several defendants and a motion for summary judgment filed by Defendant D. Haynes. (ECF Nos. 46, 54.) The court has reviewed the pleadings, relevant evidence (where appropriate), and applicable law. For the reasons discussed in detail below, the court will grant both the defendants' motion to dismiss and Haynes's motion for summary judgment.

## I.    BACKGROUND AND FACTUAL ALLEGATIONS

In his second amended complaint, Watson makes three specific claims. In Claim One, which Watson purports to bring as both a class action and an individual claim, he contends that, "[f]rom March of 2020 through April of 2021," the defendants "approved and enforced their decisions to house severely mental-ill offenders . . . in River North . . . A-2 Pod Punitive and Administration Segregation with other non-mental-ill offenders and Plaintiff." (Second Am. Compl. ¶¶ E.1(1)–E.1(2) [ECF No. 41].) Watson claims that several of the mentally ill

offenders attempted suicide during the relevant time frame and that, "on a number of occasions[,] they . . . flooded their cells and A-2 Pod with their urine and feces." (*Id.* ¶ E.1(2).) He contends the mentally ill offenders had to be forced to take showers and that they "made excessive noise by kicking their cell door, yelling and screaming at any time . . . for hours at a time." (*Id.* ¶ E.1(2), (3).) He also asserts that, on occasion, "security has refused to feed the severely mental-ill offenders." (*Id.* ¶ E.1(3).) Watson also says that security routinely gave mentally ill offenders dangerous objects, including "a toe[-]nail clipper to swallow," and that one inmate on suicide watch was "allowed . . . to cut open his left arm . . . ." (*Id.* ¶ E.1(4).)

During the same time period, Watson also complains that, when mentally ill offenders were transferred outside of the prison for treatment, upon their return to River North, "they were not COVID-19 quarantine in a separate area, but were housed in A-2 Pod with other offenders and Plaintiff." (*Id.* ¶ E.1(5).) He further claims that the air in the unit is circulated and "everybody . . . breath[e]s the same air." (*Id.*) He also alleges that the inmates were given reusable (as opposed to disposable) trays for their meals, and that one inmate "who used an adult Pampers frequently placed his Pampers containing urine and feces on his food tray when he returned the tray to security." (*Id.* (cleaned up).) Watson does concede, however, that the trays are washed after they are used. (*Id.*)

For his second claim (which he brings on his own behalf), Watson contends Defendant D. Haynes subjected him to cruel and unusual punishment because, for 12 days, she ordered that he be placed on suicide watch. (*Id.* ¶ E.2(1).) During that time, the listed precautions that Haynes authorized included: "no showers; no hygiene; no suicide blanket; no suicide spoon to eat with; no toilet [*sic*] and sink water ('Dry Cell')." (*Id.*) He also alleges that, "[p]ursuant to

Ms. Haynes['s] orders, River North Correctional Center A-2 Pod Security forced the Plaintiff to walk around in a strip cell naked and with no shoes on a cold concrete floor. Security would not flush Plaintiff's cell toliet [*sic*] that had urine and feces inside of it." (*Id.* ¶ E.2(2).) Watson asserts that he was forced to "eat under the above conditions in his cell and eat with his dirty fingers and hands," which he was also not permitted to wash. (*Id.*) As a result, he chose not to eat at all. (*Id.*)

Because he chose not to eat, he alleges that Haynes instructed that the conditions "would continue indefinitely." (*Id.* ¶ E.2(3).) He further alleges a psychologist told him that "Haynes said the only way she would approve for Plaintiff to receive a suicide blanket, Plaintiff had to eat." (*Id.*) Watson wanted to eat, he claims, but would not "because he had not taking a shower in 9 days; had no hygiene whatsoever; it was urine and feces inside his cell's toilet; his fingers and hands was dirty and he did not have a suicide spoon to eat with." (*Id.* [*sic* throughout].) As a result of Haynes's order, Watson claims he was forced "to choose between eating under the above conditions or staying in a cold cell naked without a security suicide blanket." (*Id.*) He ultimately "chose to eat under those conditions to get the blanket because he was freezing day/night." (*Id.*)

Watson's third claim is levied solely against Defendant M. Jones. Watson claims that Jones "authorized Plaintiff's Covid-19 quarantine status from November 12, 2020, until November 30, 2020, in a non-quarantine housing unit, A-2 Pod." (*Id.* ¶ E.3(1).) As noted above, Watson alleges that A-2 Pod "has a circulated air vent system—A-2 Pod Security officers and offenders who are being housed in that Pod breaths the same air." (*Id.* ¶ E.3(2).) And while Watson was housed there, "A-2 Pod Security did not wear their mask; practice

- 3 -

social distance; wash their hands as recommended by CDC and VA DOC Covid-19 policies,"
and many security personnel were "coughing and sneezing." (*Id.* ¶ E.3(3).) He also contends
that security staff "did not clean the air vents during this time period," and that security did
not "allow Plaintiff to clean his cell; to take a shower; to use the telephone; to send or receive
mail." (*Id.*)

Watson further alleges that Jones "authorized [his] quarantine status because he refused
to take the Covid-19 test." (*Id.* ¶ E.3(4).) He also claims "[s]he did not provide [him] with
information as is reasonably necessary to make an informed decision to accept or reject the
test; nor did she advise[] [him] of the consequences and circumstances of a refusal to take the
test." (*Id.*) As a result of being housed in these conditions for approximately 18 days, Watson
claims he suffered mental anguish, emotional distress, insomnia, anxiety, headaches, and "fear
of catching Covid-19 virus and attempted suicide by refusing to eat." (*Id.* ¶ E.3(6).)

After Watson was permitted to file his second amended complaint, several defendants[1]
filed the present motion to dismiss (ECF No. 46), and Defendant D. Haynes filed the present
motion for summary judgment (ECF No. 54). Both motions have been fully briefed by the
parties, and the issues are ripe for disposition.

## II.   STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal
sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it
does not resolve contests surrounding the facts, the merits of a claim, or the applicability of

---

[1] Defendants D. Anderson, T. Dowell, M. Jones, B.L. Kanode, C. Manis, H. Sharpe, and C. Whitt all joined in
the motion.

defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Legal conclusions in the guise of factual allegations, however, are not entitled to a presumption of truth. *Id.* at 678–79.

Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). "Factual allegations must be enough to raise a right to relief above the speculative level," with all the allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor. *Id.*; *see Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 346 (4th Cir. 2005). Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Consequently, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and there is "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.

To allow for the development of a potentially meritorious claim, federal courts must construe *pro se* pleadings liberally. *See, e.g.*, *Boag v. MacDougall*, 454 U.S. 364, 365 (1982). Moreover, "liberal construction of the pleadings is particularly appropriate where . . . there is a *pro se* complaint raising civil rights issues." *Smith v. Smith*, 589 F.3d 736, 738 (4th Cir. 2009)

(cleaned up). Nevertheless, "[p]rinciples requiring generous construction of *pro se* complaints are not . . . without limits." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). "A *pro se* plaintiff still must allege facts that state a cause of action." *Scarborough v. Frederick Cnty. Sch. Bd.*, 517 F. Supp. 3d 569, 575 (W.D. Va. 2021) (quoting *Bracey v. Buchanan*, 55 F. Supp. 2d 416, 421 (E.D. Va. 1999)).

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). But if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249−50 (internal citations omitted). In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874−75 (4th Cir. 1992). The evidence relied on must meet the substantive evidentiary standard of proof that would apply at a trial on the merits. *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315−16 (4th

Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment).

### III.    ANALYSIS: MOTION TO DISMISS

#### A.  Claim One: Class Action Claim

Watson brings Claim One as both a "class action claim" and a "non-class action claim." The court agrees with the defendants that any claim styled as a "class action" must be dismissed. (*See* Br. Supp. Mot. Dismiss at 4–5.) Watson is proceeding *pro se*, and it is well-settled that, in that role, he may not prosecute claims on behalf of other individuals. *See Pridgen v. Andresen*, 113 F.3d 391, 393 (2nd Cir. 1997) ("[A] person ordinarily may not appear pro se in the cause of another person or entity.") However well-intentioned, Watson lacks standing to file or otherwise pursue federal claims on behalf of other inmates. *See Hummer v. Dalton*, 657 F.2d 621, 625–26 (4th Cir. 1981) (holding that a prisoner cannot act as a "knight-errant" for other prisoners); *Jenkins v. Stirling*, No. 5:16-cv-02588-RMG-KDW, 2016 WL 11410970, at *2 (D.S.C. Sept. 1, 2016) ("Plaintiff has no standing to bring a § 1983 claim on behalf of other inmates and may only pursue claims for himself."). Accordingly, Watson's "class action claim" will be dismissed.

### B.  Claim One: Non Class Action Claim

Insofar as Watson's allegations in his "class action claim" can be read to raise a conditions-of-confinement claim on his own behalf (in that be objects to being housed with mentally ill inmates), it fails.

"The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones, and it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981); *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). "To sustain an unconstitutional conditions of confinement claim, a prisoner must show that: (1) objectively, he suffered a deprivation that was sufficiently serious, in that the challenged official acts caused denial of 'the minimal civilized measure of life's necessities'; and (2) subjectively, the defendant prison officials acted with 'deliberate indifference' to inmate health or safety." *Latson v. Clarke*, 346 F. Supp. 3d 831, 860 (W.D. Va. 2018) (quoting *Farmer*, 511 U.S. at 834). "The prisoner must show 'significant physical or emotional harm, or a grave risk of such harm,' resulting from the challenged conditions." *Id.* (quoting *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995)).

The defendants make three primary arguments in support of their motion to dismiss. First, they contend that Watson has not alleged any personal involvement by Defendants Kanode and Sharpe. (*See* Br. Supp. Mot. Dismiss at 6.) Second, because the only role Defendants Dowell, Anderson, Manis, and Whitt played in Plaintiff's alleged deprivation related to denying Watson's grievances—and because an inmate has no constitutional right to the grievance procedure—Watson has not stated a claim against those defendants. (*Id.* at 8.)

And third, even if the defendants committed a constitutional violation by housing Watson with mentally ill offenders, that right was not "clearly established" and the defendants are entitled to qualified immunity. (*Id.* at 8–9.)

Watson cogently responded to each argument in a brief in opposition.[2] (Br. Opp'n Mot. Dismiss [ECF No. 51].) As to Defendants Kanode and Sharpe, Watson concedes that he has not alleged any personal involvement against either, but contends that he can keep them as defendants to this action as an exception to the "personal involvement" requirement "for purposes of discovery to determine who the proper defendants are." (*Id.* at 6); *see also Satchell v. Dilworth*, 745 F.2d 781, 786 (2nd Cir. 1984) (permitting a plaintiff to name defendants "at least for purposes of discovery aimed at identifying those of their subordinates who are personally responsible for the departmental actions complained of").

As to the defendants' second argument, Watson contends the defendants who responded to his grievances "allowed the continuance of Prison Policy . . . to be enforced under which unconstitutional practices occurred, [and] their failure to act upon Plaintiff's grievance about the unconstitutional condition by rectifying it resulted in the 8th Amendment violation also." (Br. Opp'n Mot. Dismiss at 9.) As to the claim that a constitutional right was not clearly established and that the defendants are therefore entitled to qualified immunity, Watson points to a number of out-of-circuit cases for the proposition that the "[f]ailure to house mentally ill inmates apart from the general prison population . . . violates the constitutional rights of both groups." (*Id.* at 10–11); *Carty v. Farrelly*, 957 F. Supp. 727, 738 (D.V.I. 1997); *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 403 (6th Cir. 1999) (en banc) ("Due

---

[2] The court commends Watson on a well-written, and well-researched, brief.

to the uncontrollable behavior of the mentally ill inmates, it may be a reasonable response for prison officials to keep them all in one place, apart from the rest of the prison population. At any rate, it is a separate Eighth Amendment inquiry, not at issue here.").

On balance, the court agrees with the defendants and finds that Watson's allegations, taken as true, do not rise to the level of a constitutional violation and, even if they did, the right at issue was not clearly established and the defendants are therefore entitled to qualified immunity.[3]

Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "To overcome this shield, a plaintiff must demonstrate that: (1) the defendant violated the plaintiff's constitutional rights, and (2) the right in question was clearly established at the time of the alleged violation." *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

While the court agrees with Watson that housing mentally ill inmates with the general population is a recipe for discord and other problems, it is constrained to agree with the

---

[3] The defendants are correct that the denial of a grievance does not implicate any constitutional rights, *see Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) ("[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state."), but Watson's argument that the officials were put on notice of the conditions outlined in his grievance has some merit, *see, e.g., Kartman v. Markle*, 582 F. App'x 151, 154–55 (4th Cir. 2014) (concluding that summary judgment was not proper because the existence of a grievance could have placed an official on notice that the inmate "faced a substantial risk of harm from other inmates"). The court makes no judgment on whether the content of the grievances was sufficient to place anyone on notice of a substantial risk of harm, however.

defendants that "[n]o clearly established law dictates that housing mentally ill inmates in prisons, rather than transferring them to state mental health facilities, 'automatically and alone amount[s] to an objectively excessive risk to inmate health and safety.'" (Br. Supp. Mot. Dismiss at 10 (quoting *Adams*, 884 F.3d at 230 (cleaned up).) *Adams* concerned a mentally ill inmate, Jamycheal Mitchell, who was housed at the Hampton Roads Regional Jail rather than a state mental facility upon his arrest, even though the jail psychologist determining that he was "both manic and psychotic." *Adams*, 884 F.3d at 222. Despite a recommendation that he receive mental-health treatment, none was provided and, four months after his arrest, "Mitchell died from 'wasting syndrome' or severe malnutrition." *Id.* at 223. After noting that it was "unaware of any clearly established law (or indeed, any law at all) holding that prisons are, as a general rule, unfit to house mentally ill inmates," the Fourth Circuit concluded that the prison officials were entitled to qualified immunity on the claims brought by Mitchell's estate. *Id.* at 229–30.

The same result is compelled here. If the law did not clearly compel that Mitchell be housed in a secure mental health facility given his diagnosis, the court cannot conclude that the law was clear that Watson had a corollary right not to be housed in a pod with mentally ill offenders.[4] Without more, the mere presence of mentally ill offenders in his pod is insufficient to establish a "grave risk" of "significant physical or emotional harm." *Shakka*, 71 F.3d at 166.

---

[4] The cases Watson cites appear, at first glance, to lend support to his argument. But on closer inspection, the cases do not pass muster. First, and more importantly, controlling precedent from the Fourth Circuit, specifically *Adams*, was decided after both *Carty v. Farrelly*, 957 F. Supp. 727 (D.V.I. 1997), and *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999). Second, the language quoted from *Carty* is *dicta*; although the case concerned conditions of confinement applicable to all inmates at the Criminal Justice Complex in St. Thomas, United States Virgin Islands, the section of the opinion Watson cites only refers to the manner in which inmates identified as mentally ill by prison guards were detained. *See Carty*, 957 F. Supp. at 738–39. It does not discuss, nor does it hold, that housing mentally ill inmates on a separate floor in the same pod on non-mentally ill

To be sure, in some instances and under different circumstances, the presence of mentally ill offenders in general population with others could create a substantial risk of harm to the inmates who do not suffer from mental illness, *see, e.g.*, *Gates v. Cook*, 376 F.3d 323, 342–43 (5th Cir. 2004) (affirming trial court injunction against housing certain inmates in cells next to psychiatric patients who scream, beat on metal toilets, and throw feces, resulting in chronic sleep deprivation), but Watson's allegations are simply too sparse and conclusory to reach this threshold. Most glaringly, Watson does not allege that he was required or permitted to interact with other offenders in A-2 Pod; in other words, his claim rises and falls on whether it was a constitutional violation to house mentally ill offenders *near* him. Absent some adverse interaction, or a substantial risk of one, the court cannot say that the proximity of mentally ill inmates on the lower floor of the same pod created a substantial risk of grave harm to Watson.

Watson does allege that the mentally ill inmates would kick and scream and would often flood their cells (and the pod) with feces and urine. Notably, Watson does not allege that any of these bodily fluids encroached on his cell or that he was otherwise exposed to them. In fact, they couldn't: "[t]he severely mental-ill offenders were housed in A-2 Pod bottom tier and the

---

inmates violated both groups' constitutional rights. And *Thaddeus-X*, by its own terms, did not analyze whether housing mentally ill inmates with non-mentally ill inmates represented an Eighth Amendment violation, *see Thaddeus-X*, 175 F.3d at 403 ("At any rate, it is a separate Eighth Amendment inquiry, not at issue here."), so it would be insufficient to put prison officials nationwide on notice that mentally ill inmates cannot be housed near non-mentally ill inmates.

But even if the cases Watson cites were clear in their holding, there would still be tension with the Fourth Circuit's holding in *Adams*. And that tension, alone, means that Watson cannot show that the "contours of the right in question were so clear that every reasonable official would have understood that Defendant[s'] actions violated those rights." *Spann v. Lombardi*, No. 2:14-CV-04259, 2021 WL 5122176, at *10 (W.D. Mo. Sep. 30, 2021) (discussing the same cases cited by Watson), *rev'd on other grounds by* 65 F.4th 987 (8th Cir. 2023). Absent that showing, Defendants are entitled to the protection of qualified immunity. *See Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987).

non-mental-ill offenders were housed in A-2 Pod top tier."[5] (Second Am. Compl. ¶ E.1(5).) And insofar as an inmate placed used adult diapers on a reusable tray, Watson concedes the tray was cleaned before it was circulated back into the Pod. (*Id.*)

That leaves only Watson's allegation that, when the mentally ill inmates were returned to the pod following treatment, they were not placed in a COVID-19 quarantine. (*Id.*) Because the "air vent system is a circulation . . . [and] everybody . . . breath[e]s the same air" (*id.*), presumably Plaintiff believes the risk of a COVID-19 infection constituted a substantial risk of serious harm to him. But here his complaint is similarly deficient. Notably, he does not allege that *anyone* was housed in A-2 Pod with COVID-19. Instead, he says that, when the inmates were returned from an external appointment or treatment, they were not quarantined. (*Id.*) In other words, Watson believes that breathing air that *might* have been expelled by someone who *might* have been exposed to COVID-19 created a "grave risk" of "significant physical or emotional harm." *Shakka*, 71 F.3d at 166. This falls well short establishing actual harm, let alone constitutional injury. *Accord Futrell v. Cooper*, No. 3:20-cv-00543, 2021 WL 3199217, at *3 (W.D.N.C. July 28, 2021) (holding that the plaintiff's allegations that insufficient ventilation during the COVID-19 pandemic were insufficient to state an Eighth Amendment claim; "[t]he [p]laintiff's allegations that the Defendants failed to provide the most optimal possible conditions of incarceration during the COVID-19 pandemic is

---

[5] The presence of urine or feces *inside an inmate's cell* is generally insufficient to state a conditions-of-confinement claim. *See Goodman v. McCoy*, No. 7:12-cv-00186, 2013 WL 693103, at *10 (W.D. Va. Feb. 26, 2013) ("The Fourth Circuit has also reasoned that inmates who were held for six months in cells that were hot, flooded with water from a leak in the toilet on a floor above, infested with vermin, and smeared with urine and feces, did not state an Eighth Amendment claim based on the conditions of their confinement." (citing *Beverati v. Smith*, 120 F.3d 500, 504, 505 & n.5 (4th Cir. 1997)). It follows, then, the feces *in another inmate's cell* does not implicate Plaintiff's constitutional rights.

insufficient to state a plausible § 1983 claim"). Without more, the lack of adequate ventilation in a unit with inmates who *may* have been exposed to COVID-19 is insufficient to state an Eighth Amendment violation.

The court has also considered all the challenged conditions "in combination." "*Some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). But even taking all the challenged conditions together—mentally ill inmates being housed below him, unsanitary conditions in nearby cells, loud noises, and poorly ventilated air—Watson's allegations do not rise to the level of an Eighth Amendment violation in that their "mutually enforcing effect" is not alleged to have produced "the deprivation of a single, identifiable human need." *Id.*

In sum, Watson does not have standing to assert his "class action claim." As for his individual claim, considering his challenged conditions separately and "in combination," Watson has not alleged the violation of a clearly established constitutional right, and the defendants are entitled to the protection of qualified immunity as to Claim One.

### C. Claim Three

Defendant M. Jones also moves to dismiss Claim Three related to Watson's housing in a non-quarantine unit after he refused to take a COVID-19 test. For many of the same reasons cited above, Watson's allegations—taken as true—fail to establish that Jones subjected him to "cruel and unusual punishment." (Second Am. Compl. ¶ E.3.)

As noted above, "in a § 1983 claim against a state official under the Eighth Amendment, a plaintiff must demonstrate that (1) the alleged conduct is 'objectively, sufficiently serious'; and (2) that the prison official was 'deliberately indifferent to the plaintiff's rights, health or safety' and had a 'sufficiently culpable state of mind.'" *De'lonta v. Clarke*, No. 7:11-cv-00483, 2013 WL 209489, at *3 (W.D. Va. Jan. 14, 2013) (quoting *Farmer*, 511 U.S. at 834). Here, Watson alleges that Jones, a nurse at River North, authorized him for a COVID-19 quarantine when he refused to be tested for COVID-19 and that, as a result, he was housed in inhospitable conditions. (Second Am. Compl. ¶¶ E.3(1)–(6).) But assuming that the conditions described rose to the level of an objectively serious condition, Watson's complaint is devoid of any factual allegation indicating that Jones was aware of the allegedly deplorable conditions in the housing unit. Without it, Watson cannot show that Jones was "deliberately indifferent" to the risks to Watson's health or safety or that she acted with a "sufficiently culpable state of mind." *See De'lonta*, 2013 WL 209489, at *3.

The most that can be gleaned from Watson's allegations are that Jones authorized him for COVID-19 quarantine. (*See* Second Am. Compl. ¶ E.3(1).) Even assuming that Watson faced the risk of exposure to COVID-19 while housed in the quarantine unit, this allegation, standing alone, does not rise to the level of an Eighth Amendment violation. *See, e.g.*, *Tillery v. Va. Peninsula Reg'l Jail*, No. 1:20-cv-751, 2020 WL 6742991, at *5 (E.D. Va. Nov. 17, 2020) ("Plaintiff has not established deliberate indifference . . . simply because another inmate, who had been released from a COVID-19 quarantine, was assigned as his cellmate. '*Every person in the United States, whether in a detention facility or not, faces COVID-19 exposure.*'" (quoting *Toure v. Holt*, 458 F. Supp. 3d 387, 408 (E.D. Va. 2020)).

Absent allegations from which the court can infer that Jones knew of and disregarded an excessive risk to Watson's health or safety—which is, to be sure, an "exacting standard," *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)—Watson has failed to state a claim for a violation of his Eighth Amendment rights against Jones and Claim Three will be dismissed.

## IV.   ANALYSIS: MOTION FOR SUMMARY JUDGMENT

Claim Two is brought solely against Defendant D. Haynes, who moves for summary judgment[6] on the allegation that she subjected Watson to "cruel and unusual punishment" by authorizing his "suicide watch." (Second Am. Compl. ¶ E.2(1).)

### A. Factual Record

In support of her motion, Haynes filed an affidavit and supporting documentation that establishes the relevant facts. For his part, in his affidavit Watson does not appear to dispute them.

On November 23, 2020, Watson told Psychology Associate Barnette that he was having suicidal thoughts and anxiety.[7] (Aff. of D. Haynes, Psy. D. ¶ 8 & Encl. A, May 6, 2022 [ECF No. 55-1].) According to Haynes (and Barnette's Mental Health Services Progress Notes[8]):

> Watson reported that he was having severe anxiety surrounding
> COVID-19 and was feeling that staff were not following policies

---

[6] Haynes also moves for summary judgment on Claims One and Three. For the reasons discussed in Section III, *supra*, those claims are dismissed against her under 28 U.S.C. § 1915(e)(2)(B)(ii) or, alternatively, because she is entitled to qualified immunity (as asserted in her motion for summary judgment). (*See* Br. Supp. Mot. Summ. J. [ECF No. 55].)

[7] Critically, Watson does not dispute that he threatened to kill himself.

[8] The court can consider these notes for the truth of the matters asserted in them. *See* Fed. R. Evid. 803(4), 803(6); *Doali-Miller v. SuperValu, Inc.*, 855 F. Supp. 2d 510, 516–18 (D. Md. 2012) (analyzing the admissibility of medical records under the business-records exception to the rule against hearsay).

> to keep him from getting it. Watson reported that he had made complaints to various departments and did not feel he was receiving enough cleaning/disinfectants for his cell. Watson reported he felt like COVID would get into the facility and he would not be protected from contracting it. Watson provided an example of the air system spreading it to inmates from cell to cell without proper disinfecting practices to remedy the spread. . . . Watson denied feeling safe and stated, "I need you to put me in a strip cell."

(*Id.* ¶ 8; *see also id.* Encl. A.) Based on Watson's self-reported suicidal thoughts and request for placement in a "strip cell," Haynes "authorized that Watson be placed on safety precautions . . . [and] Watson was moved to cell A-203 . . . on November 23, 2020." (*Id.* ¶ 9.)

While on safety precautions, Watson was subject to

> (1) 15-minute watch . . . ; (2) that the lights were to remain on twenty-four hours a day in his cell; (3) that he was to be housed in a cell with a camera; (4) that he was to have no rigid, metal or sharp objects; (5) that he was to have no safety pens or pencils; (6) that he was not to be given a whole roll of toilet paper; (7) that a blanket was to be placed in front of his cell door to prevent fishing of items; and (8) that he was only to have a safety smock. Watson was to be provided with finger foods only and no utensils for eating.

(*Id.* ¶ 10.) Additionally, his meals were to be served on "rubberized" trays, and "a daily search of Watson's cell was to be conducted for any unauthorized or hidden items." (*Id.*)

The next day, Watson told Psychology Associate Spangler that he intended to drown himself and starve himself.[9] Accordingly, she recommended that Watson be placed in a "dry cell." (*Id.* ¶ 12, Encl. C.)

> A "dry cell" means that the water to the individual cell is completely turned off. If an inmate wants to wash his hands or sponge bathe, or flush the toilet, he must ask a correctional officer to turn on the water so that he can wash or flush.

---

[9] Critically, Watson does not dispute that he threatened to drown and/or starve himself.

- 17 -

> Although an inmate in a dry cell may not be able to shower, he
> can ask an officer to turn on the water and he can sponge bathe
> in the sink. Likewise, the inmate may ask that the water be turned
> on if he wants to brush his teeth or wash his hands. The water
> to his cell will be turned back off after the inmate completes his
> task.

(*Id.* ¶ 6.) Haynes's affidavit is unclear whether her approval was necessary to implement

Spangler's recommendation, but "Watson was placed on dry cell status on November 24,

2020." (*Id.* ¶ 12.)

The next week, on November 30, Psychology Associate Dr. Sturdivant went to evaluate

Watson, but noted that Watson was "unwilling to cooperate" with him. (*Id.* ¶ 13 & Encl. D.)

His notes indicate that Watson "would not deny" suicidal ideation, homicidal ideation, or

suicidal self-directed violence ("SI/HI/SDV"). (*Id.*) Sturdivant noted that Watson was

"demanding, disrespectful, entitled, and refused to answer questions about his well-being." (*Id.*

Encl. D.) As a result, Sturdivant recommended that Watson "continue safety precautions, dry

cell and safety smock only." (*Id.*)

Sturdivant returned to Watson's cell on December 1 and, "[f]or a second consecutive

day, . . . [Watson] would not deny SI/HI/SDV, and he was clearly unwilling to cooperate with

[Sturdivant]. He was again demanding, disrespectful, entitled, and refused to answer questions

about his well being." (*Id.* Encl. E.) As before, Sturdivant continued the safety precautions.

(*Id.*)

When Sturdivant returned to Watson's cell on December 3, things were markedly

different. Watson "denied all SI/HI/SDV, and any other mental health problems. (*Id.* Encl.

F.) He was curiously cooperative . . . with [Sturdivant], which could be explained by the fact

that he [had] legal mail to attend to . . . , and he [wanted] access to it. This . . . strongly

suggest[ed] [m]alingering on his part . . . ." (*Id.*) Based on his cooperation and denial of suicidal thoughts, the dry cell restriction was lifted, and Watson was provided with a safety smock and safety blanket and was permitted to take an observed shower." (*Id.*) The next day, "Watson was removed from all other safety precautions . . . ." (*Id.* ¶ 17.)

In his affidavit and brief,[10] Watson does not appear to take issue with any of the facts Haynes asserts. Rather, he recites the numerous requests he made for relief from the "dry cell" restriction. For example, he states that he "asked River North Correctional Center Captain Crigger to turn [his] sink and toilet water so that [he] could wash [his] hands, brush [his] teeth, sponge bathe, and also so [he] could flush the urine/feces that was setting in [his] toilet. [Crigger] told [Watson] that he could not per [Haynes's] dry cell order." (Watson Aff. ¶ 2.) Watson also asked River North "Correctional Officer E. Paisley . . . to turn [his] sink/toilet water on so that [he] could take care of [his] hygiene," but Paisley "refused pursuant to Defendant's [*sic*] Haynes dry cell order." (*Id.* ¶ 3.) Watson made similar requests of Officers E.A. Lawson, J. Adams, and Wilson, but they all refused "per Defendant's dry cell order." (*Id.* ¶ 5.) And when Watson requested a paper spoon to eat with "because he was not being allowed to wash [his] hands" before he ate, he contends Officer Paisley denied that request as well. (*Id.* ¶ 4.)

---

[10] Watson's brief contains numerous factual assertions that are absent from his affidavit. (*See* Br. Opp'n Mot. Summ. J. [ECF No. 70]; Aff. of Kevin A. Watson, Aug. 10, 2022 [ECF No. 70-1].) Although the brief is not a certified filing, the court accepts that Watson would testify consistently to his factual assertions in that document. But even considering these additional facts, they do not change the court's conclusions.

## B. Discussion

Haynes's primary argument in support of her motion for summary judgment is that the evidence is insufficient to establish a culpable state of mind; specifically, nothing in the record suggests that she was ever made aware of the conditions Watson was living in. On the record before it, the court must agree.

It is well-settled that, in order to succeed on an Eighth Amendment claim, a plaintiff must show that the defendant acted with a "culpable state of mind." *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). This element is satisfied "by showing deliberate indifference by prison officials." *Id.* Mere negligence does not satisfy the "deliberate indifference" standard; "[b]asically, a prison official 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837). "Thus, a prison official may be held liable for deliberate indifference only where 'the official knows of and disregards an excessive risk to inmate health or safety.'" *Goodman v. Wexford Health Sources, Inc.*, 425 F. App'x 202, 204 (4th Cir. 2011) (quoting *Farmer*, 511 U.S. at 837).

The record reveals that Haynes approved placing Watson on suicide watch and the attendant protocols, but that is as far as it goes. Although Watson says Haynes placed him on "dry cell," (Watson Aff. ¶¶ 2–6), there is no evidence of that.[11] Her affidavit does not relay

---

[11] In her affidavit, Haynes indicates that she is a Qualified Mental Health Professional ("QMHP") and that "[t]he decision to place an inmate on safety precautions[,] including placement in a dry cell,] is made by a QMHP" (Haynes Aff. ¶¶ 1, 5–6), but she does not specify whether Spangler and Barnette are also QMHPs. She implies as much by stating that Spangler "determined that Watson was appropriate for a dry cell" and that, "[p]ursuant to . . . Spangler's determination, Watson was placed on dry cell status . . . ." (*Id.* ¶ 12.) Whether that means Spangler, in fact, authorized the dry cell as a QMHP, or that Haynes's affidavit was crafted to obscure her role as the ultimate decisionmaker in this regard to protect against potential liability is unclear. But, for the

that she did, and the relevant mental health forms suggest that it was Spangler who placed him on that restriction. (*See* Haynes Aff. Encl. C.)

But even if the court were to assume that Haynes ordered that Watson be placed in a dry cell, that is still insufficient for Watson to prevail. By his own admission, it was the *misapplication* of the "dry cell" regulations that form the basis of his primary complaints, not the threshold determination that such placement was warranted. His sworn testimony is that, when he asked to have his water turned on for hygiene or flushing the toilet, the correctional officers refused, citing Haynes's order.[12] (Watson Aff. ¶¶ 2–6.) But even Watson must concede that the applicable "dry cell" procedures required that the water be turned on (*see* Haynes Aff. ¶ 6); he knows this because he requested that the water be turned on repeatedly (Watson Aff. ¶¶ 2–6).

Here, there is nothing to suggest, let alone establish, that Haynes was ever made aware that the dry-cell procedures were not being followed. Not even Watson alleges that he complained to *any* member of the psychology staff about the conditions he was facing; in fact, the uncontroverted evidence establishes that he *refused* to speak with Sturdivant on at least two occasions while he claims he was being forced to endure the cell conditions he alleges. (*See* Haynes Aff. Encls. D, E.) Absent any evidence from which the court could conclude that

---

reason discussed herein, Plaintiff's placement on "dry cell" status did not violate the Eight Amendment regardless of who authorized it.

[12] Watson also provided an affidavit from another inmate, Derrick Edwards, but Mr. Edwards only confirms that Watson requested that the water be turned on several occasions; he is unable to offer any evidence that Haynes was aware of the requests or, more importantly, the denials. (*See, e.g.,* Aff. of Derrick A. Edwards ¶ 5, Aug. 10, 2022 [ECF No. 70-1] ("From November 23, 2020, thru December 4, 2020, I heard Offender Watson ask Mr. Crigger; Mr. Pasley; Mr. Lawson; Mr. Nester; Mr. Adams; Mr. Wilson; Mr. Coyle and Mr. Profit for showers; cleaning supplies; to flush the toilet and them to turn on his sink water so he could wash his hands before he eat [*sic*]. All named Officers refused Offender Watson's request pursuant to Doctor Ms. Haynes.").)

Haynes was aware that correctional officers were refusing to turn on Watson's water when requested, Watson is unable to establish that she *knew of* a serious risk to his health.[13]

That leaves only Watson's allegation that, by placing him on "suicide watch" without any substitutions, Haynes violated his Eighth Amendment rights. The record evidence establishes that Watson represented that he was suicidal and that he intended to drown himself. In response, Haynes placed him on certain restrictions that were plainly directed at preventing self-harm—and the specific self-harm he threatened. (*See generally* Haynes Aff. ¶¶ 6–12.) When Watson finally spoke to someone from the psychology staff and denied any further suicidal thoughts or ideations, his restrictions were lifted. (*Id.* ¶¶ 13–14.) Haynes's actions (on the uncontroverted record) were clearly aimed at protecting Watson from an excessive risk to his safety, and nothing about those precautions, individually or "in combination," exposed Watson to a risk of harm.

Even if the court were to agree with Watson that the denial of his various requests for "accommodations" to the precautions imposed on him amounted to an objectively serious deprivation, the record is still devoid of any evidence that Haynes was made aware of his requests. Absent such knowledge, Watson is unable to establish the second element of an Eighth Amendment violation—that Haynes knew of and disregarded "an excessive risk to" Watson's "health and safety." *Farmer*, 511 U.S. at 837.

The court has also considered the conditions of the dry cell "in combination" and agrees that, even assuming that half of his allegations are true, he has more than raised the

---

[13] Watson tacitly concedes that Haynes was unaware of the conditions of his cell. He states that, "[n]ot one time did Defendant visit Plaintiff . . . ." (Br. Opp'n Mot. Summ. J. at 21.)

specter of an Eighth Amendment violation. *Compare Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (citing "a low cell temperature at night combined with a failure to issue blankets" as an Eighth Amendment violation), *with* Second Am. Compl. ¶ E.2(2)–(3) (describing being naked in a cold cell without a blanket). But on the record before the court, his claims are not properly directed at Haynes,[14] and she is entitled to summary judgment.

## V.   CONCLUSION

Watson's testimony paints a grim, disturbing portrait of the conditions in which he was housed. Being forced to sleep without a blanket and in only a smock in a "freezing" cell is certainly cruel and unusual, not to mention the other indignities Watson alleges that he endured. But nothing in his complaint or record evidence suggests that any of the named defendants were aware of the conditions in Watson's cell. Absent that threshold evidence, Watson's claims *against these defendants* cannot proceed. For these reasons and those discussed above, the defendants' motion to dismiss and Haynes's motion for summary judgment will be granted.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 29th day of September, 2023.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[14] Watson's allegations make this clear: "I asked . . . Captain Crigger to turn on my sink and toilet water . . . . He told me that he could not." (Watson Aff. ¶ 2); "I asked . . . E. Paisley . . . to turn my sink/toilet water on . . . . He refused . . . ." (*Id.* ¶ 3); "I also asked Officer E. Paisley for a paper suicide spoon to eat with . . . . He refused to give me one . . . ." (*Id.* ¶ 4); "I also asked . . . Officers E.A. Lawson, J. Adams and Wilson to turn my sink/toilet water on to bathe and to flush my toilet. They refused per [Haynes's] dry cell order." (*Id.* ¶ 5.) (*See also* Aff. of Kevin A. Watson ¶¶ 2–5, Jan. 12, 2022 [ECF No. 39-1].)